CHRISTOPHER F. MORALES (SBN 153152)
Attorney at Law
MATTHEW R. HAAS (SBN 327678)
Associate Attorney
1388 Sutter St, Suite 805
San Francisco, CA 94109
Telephone: (415) 552-1215
Fax: (415) 674-7643
Email: chris@moralesdefense.com

Attorneys for the YUI LUN WU

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES,<br><br>    Plaintiff,<br><br>  vs.<br><br>YUI LUN WU,<br><br>    Defendant.<br>_____ | ) Case No.: 3:19-cr-00255<br>)<br>) **DEFENDANT'S SENTENCING**<br>) **MEMORANDUM AND STATEMENT**<br>) **IN MITIGATION**<br>)<br>) Judge: Honorable William H. Alsup<br>) Dept: Courtroom 12<br>) Date: October 6, 2020<br>) Time: 1:00 p.m. |

TO THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA:

  PLEASE TAKE NOTICE THAT on the above-noted date, the Defendant, Mr. Yui Lun Wu, by and through counsel, hereby files the following Sentencing Memorandum and Statement in Mitigation.

## **I. INTRODUCTION**

  The Defendant, Yui Lun Wu a.k.a. Roland Wu (hereafter 'Roland' or 'Mr. Wu'), hereby submits his sentencing memorandum and statement in mitigation. On June 30, 2020, Roland pled guilty to two felony counts: one count of violating Title 18 of the United States Code (hereafter '18 U.S.C.') §2252, subsections (a)(1) and (b)(1) [Transportation of Child Pornography] and one

count of violating 18 U.S.C. §2252, subsections (a)(4)(B) and (b)(2) [Possession of Child Pornography]. Roland is now before this Court for his sentencing.

Based on his personal background, the integral role Roland played in getting his family to the United States, the integral role Roland continues to play in financially supporting his family, the potential Roland has to positively contribute to his community and society as a whole, and Roland's remorsefulness and willingness to do whatever it takes to change his behavior moving forward, this Court should balance the People's interest in punishment with the reality of Roland's conduct and sentence him to five years in federal prison.

## II. STATEMENT OF FACTS ABOUT YUI LUN WU A.K.A. "ROLAND WU"

### A. ROLAND'S BACKGROUND

Roland is a 33 year-old Asian male, but he is also much more than that. Roland is incredibly bright, hard-working, and, with the obvious exception of the behavior that led to his conviction, one of the most selfless people you could ever meet.

Roland was born on June 12, 1987 in Hong Kong. Roland's family was working class, with both of his parents working for the local school district until his mother had to quit due to health issues. Roland was a very gifted student, his intelligence being a trait that was evident from a young age. His parents believed that he was destined to accomplish much more than their working class socioeconomic status in Hong Kong could provide, so they applied for their family to immigrate to the United States when Roland and his sister, Aileen Wu, were very young.

### B. IMMIGRATION

In 2004, the Wu family finally heard back that their immigration paperwork had been processed. With Roland's educational opportunities being the driving force behind his family's move, the Wu family immigrated to the United States in April of 2005.

However, the Wu family's transition to the United States was not an easy one. An incredible language barrier as well as difficulties finding work for Roland's parents made the first few years of their new life in the United States stressful and anxiety-ridden. Despite these

2

DEFENDANT'S SENTENCING MEMORANDUM AND STATEMENT IN MITIGATION

CASE NO.: 3:19-CR-00255

challenges, both social and financial, Roland began to pursue higher education in an effort to create a better life for his family.

## C. EDUCATION

Less than two months after their life-altering move to the United States, Roland began majoring in chemistry at Chabot College in Hayward, CA in June of 2005. After demonstrating his talents for the sciences and having great success at Chabot College, Roland was able to transfer to the University of California at Berkeley, where he continued his coursework starting in August of 2007. Despite continuing language challenges and the extreme rigor of the science programs at UC Berkeley, Roland continued his academic success majoring in Chemistry, with a minor in Nuclear Engineering, and related coursework in Plasma Physics, Nuclear Fusion Technology, Nuclear Physics, Neutronics, Thermodynamics, Quantum Physics, and Nuclear Chemistry.

In just one year, Roland became the first college of chemistry student in UC Berkeley history to be awarded the Melvin J. Heger-Horst fellowship in 2008. In May of 2009, Roland received his Bachelor of Science degree, graduating with an outstanding 3.83 grade point average. Just by looking at his GPA alone, it would be easy to consider this an incredible achievement. However, Roland was able to reach this level of success while paying for his entire education himself through his fellowship scholarship, financial aid, and working as a part-time watch repair technician every night after school, including weekends.

Roland's education pursuits in order to create a better life for his family did not stop there. In August of 2010, Roland began attending the University of Illinois at Urbana-Champagne for graduate school. It was during this time that Roland also began his professional society membership with the American Vacuum Society, a society that decided to award him with two consecutive Plasma Science and Technology Division Travel Awards in 2012 and 2013. In May of 2013, Roland earned his Master's degree in Chemistry. Then, in May of 2016, Roland earned his Ph.D. (Doctor of Philosophy) in Nuclear, Plasma, and Radiological

DEFENDANT'S SENTENCING MEMORANDUM AND STATEMENT IN MITIGATION

CASE NO.: 3:19-CR-00255

Engineering. In order to help pay for his graduate school education, Roland, in addition to his coursework, continued to work, this time as a graduate teaching assistant for various professors' classes in the Plasma Laboratory, in Energy Systems, and in Modeling Nuclear Energy Systems.

## D. WORK AND PROJECT EXPERIENCE

After getting his Ph.D., Roland got a job working as a Systems Engineer for Applied Materials, Inc., where he worked until August of 2019. Early on his career, Roland became a key cog in the Applied Materials' project developing "Diagnostics for Ionized Physical Vapor Deposition Chambers."

Some of the other noteworthy projects that Roland has worked on during his so far short, but highly successful, career include: (1) a project for Boeing developing "Coatings at Atmospheric Pressure for Aerospace Applications"; (2) a project for Dexter Magnetic Technologies developing "Large Scale Plasma Deposition using High Powered Pulsed Magnetron Sputtering"; (3) a project for General Motors developing "Atmospheric Plasma processing for Fiberglass Material"; and (4) a project for General Electric: Aviation developing "Laser Assisted Plasma Coating at Atmospheric Pressure."

## E. PATENTS AND PUBLICATIONS

During his again short, but highly successful, career thus far, Roland has already been an integral part of two teams of engineers and scientists responsible for securing patents, including: (1) being the first-named team member in a patent for a "substrate processing method and apparatus"; and (2) being the second-named team member in a patent for an "apparatus and method for depositing coating on a substrate at atmospheric pressure."

Roland's work has also been published in highly-regarded scientific journals on five separate occasions, including: (1) "SiOx Deposition on Polypropylene-coated Paper with a Dieletric Barrier Discharge" in Issue 99 of IEEE Transactions on Plasma Science; (2) "Predicting Thin Film Stoichiometry in V-O2 Reactive Sputtering" in Volume 21.2 of Materials Science; (3) "Atmospheric Pressure Dielectric Barrier Discharge (DBD) Post Annealing of

DEFENDANT'S SENTENCING MEMORANDUM AND STATEMENT IN MITIGATION
CASE NO.: 3:19-CR-00255

Aluminum Doped Zinc Oxide (AZO) Films" in Volume 251 of Surface and Coatings Technology; (4) "Deposition of Aluminum Oxide by Evaporative Coating at Atmospheric Pressure" in Volume 237 of Surface and Coatings Technology; and (5) "Electrical and Optical Characteristics of Cylindrical Non-Thermal Atmospheric Pressure Dielectric Barrier Discharge Plasma Sources" in Volume 234 of Surface and Coatings Technology.

## F. THE LIFE HE CREATED AND CONTINUES TO FINANCE FOR HIS FAMILY LED TO HIGH LEVELS OF STRESS AND ANXIETY

Due to all of the incredibly hard work Roland put into his education and building his successful career as a Systems Engineer, Roland was able to get a job where he made enough money to financially support himself and his entire immediate family.

Since they moved to the United States, Roland helped his parents pay rent for the family's residence. Once he got his first job out of school, Roland began paying the entirety of the rent for the home shared by him, his younger sister, and his aging parents. Most recently, Roland purchased and continues to pay the mortgage on the house that he, his younger sister, and his parents now live in.

Roland's parents are now 63 years and 60 years of age, father and mother respectively, and are battling health problems including retinal detachments, heart issues, glaucoma, and hypertension. Roland's younger sister, Aileen, also suffers from health problems – namely liver and thyroid issues. Roland's family's health issues have limited their ability to work – not that their previous jobs as an IHSS provider (father) and cafeteria assistant (mother) really made much money before they were forced to work less – and thus Roland has been under immense pressure as the family's primary, and more recently, sole, financial provider.

Despite his full acceptance of the difficult situation Roland has now put his family in as a result of his actions, Roland desperately hopes that this Court will take into consideration his extremely challenging home situation when determining his sentence. That way, sometime in the future, Roland may return to working full time in order to continue his financial support of his family.

5

DEFENDANT'S SENTENCING MEMORANDUM AND STATEMENT IN MITIGATION
CASE NO.: 3:19-CR-00255

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## III. THE FACTS BEFORE THE COURT JUSTIFY A REASONABLE SENTENCE

### A. ROLAND IS A YOUNG MAN WITH A GREAT DEAL OF POTENTIAL AND NO PREVIOUS CRIMINAL HISTORY

Prior this conviction for violations of 18 U.S.C. §2252, Roland had never before been arrested for or convicted of any criminal offense. Aside from the unfortunate behavior that led to his conviction in this case, Roland was an upstanding member of the community who, through hard work and incredible dedication to his studies, was able to build a successful career and financially support his family.

At 33 years of age, Roland is still a young man who is capable of changing his life for the better. Roland, with his incredible intelligence and work ethic, has so much that he can contribute to the world, and more specifically, to the San Francisco community. If Roland were to be sentenced to five years in federal prison, it would provide him with more than enough time to reflect on his mistakes, learn healthy coping mechanisms to deal with stress and anxiety in the future, and improve his behavior so that similar behavior would not occur in the future.

### B. ROLAND IS HIGHLY REMORSEFUL, DESPITE DIFFICULTY EXPRESSING HIS EMOTIONS

Roland, if it is not already clear from the above education and work experience sections, is a highly intelligent and accomplished engineer who has spent the majority of his life dedicated to studying the sciences. Roland is also a very serious person for whom English is his second language. Unfortunately, due to the combination of these traits, Roland also fits perfectly into the stereotype about scientists being individuals who struggle to express their emotions. While he possesses a great deal of intellectual prowess, his emotional expressiveness is often lacking.

However, that does not mean that Roland is not incredibly remorseful for the behavior that led to his conviction in this case, because he is. Roland knows that his actions were wrong, that his actions furthered a terrible cycle of the abuse of minors, and he is willing to do whatever it takes in order to change his behavior in the future. Roland is truly ashamed of his poor judgment and only asks for the opportunity to better himself, the opportunity to become a law-

6

DEFENDANT'S SENTENCING MEMORANDUM AND STATEMENT IN MITIGATION

CASE NO.: 3:19-CR-00255

abiding citizen moving forward, and the opportunity to support his family financially after serving his sentence. (See Exhibit A – Defendant's Letter of Apology.)

## IV. UNITED STATES SENTENCING COMMISSION'S REPORT ON FEDERAL CHILD PORNOGRAPHY OFFENSES

The United States Sentencing Commission (hereafter 'Sentencing Commission') undertook a multi-year examination of offenders sentenced under the Federal Sentencing Guidelines, ultimately publishing a report (hereafter 'CP Report') in 2012 which was submitted to Congress.[1] The primary focus of the CP Report was on §2G2.2 of the United States Sentencing Guidelines (hereafter 'U.S.S.G. §2G2.2'), and it identified three categories of behavior that should be considered by courts when imposing sentences in §2G2.2 case:

> (1) the content of an offender's child pornography collection and the nature of the collecting behavior (in terms of volume, the types of sexual conduct, ages of the victims, and the extent to which an offender has organized, maintained, and protected his collection over time, including through the use of sophisticated technologies);
> (2) the degree of an offender's involvement with other offenders – in particular in an Internet "community" devoted to child pornography and child sexual exploitation; and
> (3) whether the offender has a history of engaging in sexually abusive, exploitative, or predatory conduct in addition to the child pornography offense.[2]

### A. CRITICISM OF AND DISAGREEMENT WITH U.S.S.G. §2G2.2

One of the biggest criticisms of U.S.S.G. §2G2.2 in the CP Report, and a criticism that is echoed by various district and circuit courts across the United States, is that the creation of the

---

[1] *See* United States Sentencing Commission Report to Congress: *Federal Child Pornography Offenses* (2012), available at: <https://www.ussc.gov/research/congressional-reports/2012-report-congress-federal-child-pornography offenses>.

[2] *Id.*

DEFENDANT'S SENTENCING MEMORANDUM AND STATEMENT IN MITIGATION

CASE NO.: 3:19-CR-00255

guideline was not based on empirical research.[3] While most guidelines are created based on study and examination of past practices, such is not the case with §2G2.2.[4]

Aside from the non-empirical creation of the guideline, the Sentencing Commission, in its CP Report, determined that §2G2.2 is "overly severe" and inconsistently applied – specifically noting that there was a growing belief that the existing sentencing scheme no longer distinguished adequately amongst offenders based on degrees of culpability and dangerousness.[5]

These problems articulated in the CP Report are demonstrated through the arbitrary nature of the enhancements included in §2G2.2, namely the enhancement based on the number of images possessed by the offender, including the attribution of 75 images for each video file, and the enhancement based on the offender's use of a peer-to-peer program (ex. Limewire, Ares, BitTorrect, etc.).[6] In the CP Report, the Sentencing Commission stated that the enhancement for number of images is generally not associated with significantly higher rates of criminal sexually dangerous behavior, and it specifically noted that several district courts have recognized that the number of images chosen by Congress is arbitrary and so low that the majority of defendants receive the highest possible enhancement.[7] In fact, in his study regarding possible reforms to the Federal Sentencing Guidelines, Troy Stabenow discussed the §2G2.2 enhancement for an offender's use of a peer-to-peer program and its relationship with the number of images

---

[3] U.S. Sent'g Comm'n Report at 21.

[4] *See United States v. Dorvee* (2nd Cir. 2010) 616 F.3d 174, 184-85 ["Instead, at the direction of Congress, the Sentencing Commission has amended the Guidelines under § 2G2.2 several times since their introduction in 1987, each time recommending harsher penalties."].

[5] U.S. Sent'g Comm'n Report at 21 [Executive Summary].

[6] *Id.* at 204.

[7] *United States v. Kelly* (D. N.M. 2012) 868 F.Supp.2d 1202, 1209; *See United States v. Mallatt* (D. Neb. 2013) 2013 WL 6196946 [unpublished]; *See United States v. R.V.* (E.D.N.Y. 2016) 157 F.Supp.3d 207.

DEFENDANT'S SENTENCING MEMORANDUM AND STATEMENT IN MITIGATION

CASE NO.: 3:19-CR-00255

enhancement, and asserted that when using a peer-to-peer program, "it takes marginally more effort to collect 10,000 images than it does to collect ten."[8]

### B. ENHANCEMENTS THAT APPLY IN NEARLY EVERY CASE DO NOT SERVE THEIR PURPOSE.

According the CP Report, the enhancements for possessing materials depicting prepubescent minors, use of a computer, and number of image **applied in over 95% of all §2G2.2 cases**.[9] The enhancement for possession of material portraying violent or sadomasochistic conduct applied in a slightly lower majority of 74% of all §2G2.2 cases.[10] Finally, approximately 70% of all offenders who received enhancements based on the number of images received the maximum 5-level increase based on possession of 600 images or more.[11]

Enhancements were originally intended to provide additional proportional punishment for aggravating conduct. However, under §2G2.2, the enhancements have essentially become inherent to the crime itself and not aggravating factors describing a more serious offense or higher risk of harm.[12]

### C. THE §2G2.2 ENHANCEMENTS AS APPLIED IN MR. WU'S CASE.

In the Presentencing Investigation Report (hereafter 'PSR') for Mr. Wu's case, the following enhancements were added as part of the Offense Level Computation:

---

[8] Troy Stabenow, *A Method for Careful Study: A Proposal for Reforming the Child Pornography Guidelines*, available at: <https://www.fd.org/sites/default/files/criminal_defense_topics/essential_topics/sentencing_resources/deconstructing_the_guidelines/fsr-2011-24-2-108.pdf>, at p. 18.

[9] U.S. Sent'g Comm'n Report (for 2010).

[10] *Id.*

[11] *Id.*

[12] *See Kelly*, 868 F.Supp.2d at 1208-09.

DEFENDANT'S SENTENCING MEMORANDUM AND STATEMENT IN MITIGATION

CASE NO.: 3:19-CR-00255

    (1) involved material depicting prepubescent minors [2-level increase];[13]

    (2) involved distribution other than that described in subdivisions (A) through (E) (i.e. involving the use of BitTorrent – a peer-to-peer program) [2-level increase];[14]

    (3) involved material portraying sadomasochistic conduct [4-level increase];[15]

    (4) involved use of a computer or an interactive computer program [2-level increase];[16] and

    (5) involved possession of 4,650 images (including the 62 videos which were counted as having 75 images each) [maximum 5-level increase].[17]

Based on these enhancements applied in the PSR for Mr. Wu's case, he would fall under the 95% of offenders that are stuck with the material portraying prepubescent minors, use of a computer, and number of images enhancements, the 74% of offenders that are stuck with the material portraying sadomasochistic conduct enhancement, and the 70% of offenders that are stuck with the maximum 5-level increase to their base offense level for possession of 600 images or more.

It seems highly unfair and unjust that Mr. Wu, an offender who is arguably on the lower end of the seriousness spectrum according to the three factors considered by courts during sentencing in child pornography cases (i.e. Mr. Wu has a relatively average collection – given that 70% of offenders have at least 600 images – that he collected through non-sophisticated technology, BitTorrent, he had zero interaction with members of the Internet "community" devoted to child pornography other than his use of the peer-to-peer program BitTorrent, and he has no history of sexually exploitative or predatory conduct), would receive a high-end sentence because of the application of five distinct enhancements carrying a combined 15-level increase to his base offender level.

---

[13] U.S.S.G. §2G2.2(b)(2).

[14] U.S.S.G. §2G2.2(b)(3)(F).

[15] U.S.S.G. §2G2.2(b)(4)(A)(B).

[16] U.S.S.G. §2G2.2(b)(6).

[17] U.S.S.G. §2G2.2(b)(7)(D).

DEFENDANT'S SENTENCING MEMORANDUM AND STATEMENT IN MITIGATION

CASE NO.: 3:19-CR-00255

1

2

## V. CONCLUSION

3

    For the above-stated reasons, Mr. Wu respectfully request that this Court impose the

4

minimum sentence allowed of five years in federal prison.

5

DATED: September 17, 2020                           By: *Christopher Morales*

6

                                                    Christopher F. Morales

7                                                   Attorney for the Defendant

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT'S SENTENCING MEMORANDUM AND STATEMENT IN MITIGATION

CASE NO.: 3:19-CR-00255